IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
ABERDEEN DIVISION

RONNY STEVE COOPER, JR.                                                    PLAINTIFF

v.                                                    CIVIL ACTION NO. 1:24-CV-191-SA-DAS

NORTH MISSISSIPPI MEDICAL CENTER, INC.                                     DEFENDANT

ORDER AND MEMORANDUM OPINION

On October 22, 2024, Ronnie Steve Cooper, Jr. initiated this lawsuit by filing his Complaint [1] against North Mississippi Medical Center, Inc. ("NMMC"). Cooper brings claims of discrimination, failure-to-accommodate, and retaliation under the Rehabilitation Act. Now before the Court is NMMC's Motion to Strike Jury Demand [56] and its Motion for Summary Judgment [58]. Both Motions [56, 58] have been fully briefed and are ripe for review. Having considered the parties' filings and the applicable authorities, the Court is prepared to rule.

*Relevant Factual and Procedural Background*

In 1999, NMMC hired Cooper as an installer in its Information Services ("IS") group. At the outset, the Court notes that, based on the parties' filings in the case, NMMC's organizational structure is somewhat unclear. Both parties seemingly use the terms "group" and "department" interchangeably when referring to IS.[1]

Nonetheless, after piecing together evidence from the record, it seems clear that IS encompasses "over 250 people" and is properly characterized as the larger "group" which is divided into multiple "departments." [64], Ex. 1 at p. 174. Relevant here, John West, Director of Technical Service Operations/Chief Technology Officer, oversaw "50-plus team members" across

---

[1] Additionally, at times, Cooper refers to the IS group as the "IT department" and NMMC refers to Information Services as "Information Systems." [64], Ex. 1 at p. 173; [67] at p. 4.

four departments within the IS group including Cooper's department. [64], Ex. 2 at p. 18. Having made that clarification, the Court turns to the factual allegations.

Within his department, Cooper's duties included installing, updating, and troubleshooting computers and other electronic equipment. He performed substantially the same duties throughout his tenure with NMMC. At the time of his termination in July 2023, Cooper held the job title "Specialist 1 End User Device [("EUD")] Support" and had a base pay rate of $30.56 per hour. [64], Ex. 1 at p. 45. Cooper's role required "field work," which included physically hauling and installing equipment, and "desk work," which included "imaging" and setting up software on computers. While employed with NMMC, Cooper was never subject to any disciplinary action.

On July 5, 2019, Cooper was in a motorcycle accident. As a result of the accident, Cooper's right leg was amputated from the knee down. He now requires a prosthetic leg to stand and walk. Despite this hinderance, Cooper testified that he "can hold [his] own walking." [64], Ex. 1 at p. 49.

Following the accident, NMMC put Cooper on medical leave until October 2019 when he received his prosthetic leg. When he returned to work, Cooper had some mobility limitations and West testified that Cooper's supervisor, Perry Morgan, "worked with [him] to accommodate" and "allowed [him] to just do … desk work." [64], Ex. 2 at p. 20. Cooper described this "accommodation" as an informal agreement with his coworkers that "[he] did their work setting up their computers and laptops, and they took them out into the field." [64], Ex. 1 at p. 96. Despite this arrangement, Cooper testified he was physically capable of doing field work, but he did struggle to get equipment through two specific warehouse doors. *Id.* at p. 80, 97.

As part of his duties, Cooper was frequently required to go into the IT warehouse to retrieve equipment. This warehouse has two separate "two-hour fire-rated" doors. One door was between

2

the warehouse and Cooper's office area ("interior door"), and the other door was between the warehouse and the outside loading dock and ramp ("exterior door"). These doors had a raised lip at the bottom of the door frame. Cooper testified these doors were very heavy and coworkers would often hold the doors open for each other when transporting equipment through them. *Id.* at p. 78-79. However, Cooper regularly had to maneuver equipment through these doors on his own, which caused him to fall on multiple occasions.[2]

According to Cooper, the first time one of the "two-hour fire-rated" doors caused him to fall was a few weeks after he returned to work in October 2019. After witnessing this fall, a co-worker suggested to Cooper that an automatic door opener might be beneficial for him. Cooper immediately made a request for automatic doors to the IS group management team, which included Steve Newby, EUD Supervisor; Perry Morgan, EUD Manager; and John West. Cooper testified that he continued to make verbal requests for this accommodation on a weekly or bi-weekly basis until his termination.

In response to Cooper's requests, NMMC eventually contacted a contractor about installing automatic doors and, in July 2022, received a quote for $5,789.00. NMMC testified that the price was not an issue, but the legal department requested several changes to other terms of the quote. After some correspondence, the contractor stopped responding to NMMC's emails. Ultimately, NMMC did not seek out a new contractor and instead turned the request for automated doors over to their in-house engineering department. During Cooper's tenure, no modifications were made to either door. Following Cooper's termination, the engineering department installed a "hold-open" function on the exterior door but not on the interior door.[3]

---

[2] In addition to the falls caused by the doors, Cooper testified that he also fell on his own (unrelated to these doors) on two other occasions.

[3] Through its Rule 30(b)(6) designee, NMMC testified that the design of the interior door made it impossible to install a "hold-open" function.

3

Cooper testified that he fell passing through the interior door on two separate occasions in the months leading up to his termination. Specifically, on January 31, 2023, Cooper's prosthetic leg got caught in the interior door, causing him to fall and sustain a minor back injury. He left work to seek medical treatment. On May 16, 2023, Cooper again fell when he tried to push a cart full of laptops through the interior door and his prosthetic foot got pinned between the lip and the door. This fall resulted in Cooper bleeding from the nub of his amputated leg. He again left work to seek medical treatment.

After the fall on May 16, 2023, Cooper told John West that he would bring a lawsuit if the interior door was not fixed to accommodate him. Cooper testified that West laughed in response.

In July 2023, due to rising per-patient costs after the COVID-19 pandemic, NMMC implemented a 400-person reduction in force ("RIF"). West testified that Dr. Chris Davis directed him and other managers to reduce the total headcount of the IS group by 6%. The directive did not require West to individually reduce each department he oversaw by 6%; instead, all departments within IS, in total, needed to be reduced by 6%. West ultimately recommended EUD Manager Perry Morgan, Systems Operations employee David Varney, and Cooper to be included in the RIF.[4] Dr. Davis accepted these recommendations and West testified that these terminations, in addition to terminations by other IS group managers, "hit the 6 percent [goal]." [64], Ex. 2 at p. 13; *see also* [58], Ex. 2 at p. 3-4.

West defined his RIF selection criteria as "basically which [] employee do I think I can live without affecting operations – or [] least impact operations." [64], Ex. 2 at p. 13. West then explained that Cooper shared the same job title as 14 other employees, but he chose Cooper

---

[4] The HR Department directed West to terminate Morgan because he held a redundant middle management position. [64], Ex. 2 at p. 14. To be clear, besides Morgan, West decided which positions and departments were (or were not) reduced. *Id.* at p. 12.

because "[Cooper] was doing [] less than other people" because he primarily worked "imaging" computers. *Id.* at p. 20. West also testified that he knew Cooper had mobility issues and that is why he was allowed to primarily do desk work. On July 13, 2023, NMMC terminated Cooper.

Cooper now brings this suit for discrimination, failure-to-accommodate, and retaliation under the Rehabilitation Act. NMMC seeks dismissal of all claims.

*Analysis and Discussion*

As noted previously, NMMC has filed two Motions [56, 58]. Because the Motion to Strike Jury Demand [56] potentially affects the summary judgment standard, the Court will address it first before turning to the Motion for Summary Judgment [58].

I.      *Motion to Strike Jury Demand [56]*

In his Complaint [1], Cooper seeks "actual and punitive damages to be determined by a jury, reinstatement, and reasonable attorneys' fees, costs, and expenses." [1] at p. 4. The Court notes that Cooper's claims arise solely under §504 of the Rehabilitation Act. Importantly, the remedies available under § 504 of the Rehabilitation Act are, by statute, the same as Title VI. 29 U.S.C.A. §794a(2). In addition, as the Court will explain hereinafter, the same remedies are available under Title VI and Title IX. *Guardians Assoc. v. Civil Serv. Comm'n*, 463 U.S. 582, 594, 103 S. Ct. 3221, 77 L. Ed. 2d 866 (1983).

With that background, NMMC argues that only equitable relief is available under § 504 of the Rehabilitation Act. And, because damages are limited to equitable relief, Cooper is not entitled to a jury trial. In response, Cooper argues that the Seventh Amendment entitles him to a jury trial. At the outset, the Court notes that NMMC's argument stems from the fact that damages available under the Rehabilitation Act are limited. *See Cummings v. Premier Rehab Keller, PLLC*, 596 U.S. 212, 230, 142 S. Ct. 1562, 212 L. Ed. 2d 552 (2022) (holding that emotional distress damages are

not recoverable under the Rehabilitation Act); *Barnes v. Gorman*, 536 U.S. 181, 189-90, 122 S.

Ct. 2097, 153 L. Ed. 2d 230 (2002) (holding that because punitive damages are not available under

Title VI, they may not be awarded under the Rehabilitation Act).[5]

Here, given the limited damages that are available under the Rehabilitation Act, the only

alleged remedy that could entitle Cooper to a jury trial is his claim for backpay. So, the crux of

this issue is whether a claim for backpay under § 504 of the Rehabilitation Act is a legal or

equitable remedy. If it is a legal remedy, Cooper is entitled to a jury trial. If it is an equitable

remedy, then he is not. *See Curtis v. Loether*, 415 U.S. 189, 194-98, 94 S. Ct. 1005, 39 L. Ed. 2d

260 (1974).

In determining whether a plaintiff is entitled to a jury trial, the Court must first look to the

language of the statute. *See Tull v. United States*, 481 U.S. 412, 417 n.3, 107 S. Ct. 183, 95 L. Ed.

2d 365 (1987). If the statute is silent regarding the right to a jury trial, then the Court must

determine whether a jury trial is constitutionally required under the Seventh Amendment. *Id.*; *see*

*also Chauffeurs, Teamsters & Helpers, Local No. 391 v. Terry*, 494 U.S. 558, 564 n.3, 110 S. Ct

1339, 108 L. Ed. 2d 519 (1990).

A.  *Rehabilitation Act*

Beginning with the statutory language, §504 of the Rehabilitation Act provides in pertinent

part:

> No otherwise qualified individual with a disability in the United
> States, as defined in section 705(20) of this title, shall, solely by
> reason of her or his disability, be excluded from the participation in,
> be denied the benefits of, or be subjected to discrimination under
> any program or activity receiving Federal financial assistance or
> under any program or activity conducted by an Executive agency or
> by the United States Postal Service.

---

[5] In *Barnes*, the Supreme Court explained that because there is only an implied right of action under Title VI, it is "less clear what remedies are available" and regularly applies a contract law analogy to determine the scope of damages. *Barnes*, 536 U.S. at 185-86, 122 S. Ct. 2097.

29 U.S.C. § 794(a).

Importantly, §504 expressly incorporates the "remedies, procedures, and rights set forth in title VI of the Civil Rights Act of 1964[,]" and, as the Court noted previously, Title VI includes the same remedies as Title IX. *Id.* at § 794a(a)(2); *Guardians*, 463 U.S. at 594, 103 S. Ct. 3221. As other courts have recognized, neither § 504 of the Rehabilitation Act nor Title VI provide any guidance on the availability of a jury trial in a private action. *See Waldrop v. Southern Co. Servs., Inc.*, 24 F.3d 152, 155 (11th Cir. 1994); *see also Dodd v. City Univ. of New York*, 541 F. Supp. 3d 318, 323 (S.D. N.Y. June 1, 2021). However, as the Court will discuss *infra*, Title IX allows legal damages and thereby jury trials. *See Franklin v. Gwinnett Cnty. Pub. Schs.,* 503 U.S. 60, 66-68, 112 S. Ct. 1028, 117 L. Ed. 2d 208 (1992).

Since the statutory language is silent on this point, the Court turns to the Seventh Amendment. *See, e.g., Tull*, 481 U.S. at 417 n.3, 107 S. Ct. 1831 ("Nothing in the language of the Clean Water Act or its legislative history implies any congressional intent to grant defendants the right to a jury trial during the liability or penalty phase of the civil suit proceedings. Given this statutory silence, we must answer the constitutional [Seventh Amendment] question presented.").

*B. Seventh Amendment*

The Seventh Amendment provides:

> In Suits at common law, where the value in controversy shall exceed twenty dollars, the right to a jury shall be preserved, and no fact tried by a jury, shall be otherwise re-examined in any Court of the United States, than according to the rules of common law.

U.S. CONST. AMEND. 7.

This amendment extends the right to a jury trial to all suits where *legal* rights are involved, whether at common law or arising under federal legislation. *Waldrop*, 24 F.3d at 156 (citing *Curtis*

*v. Loether*, 415 U.S. at 194, 94 S. Ct. 1005)) (emphasis added); *see also Pandazides v. Virginia Bd. of Educ.*, 13 F.3d 823, 828 (4th Cir. 1994). In contrast, the right to a jury trial does not extend to cases in which only *equitable* rights are at stake. *Curtis*, 415 U.S. at 198, 94 S. Ct. 1005 (emphasis added).

When deciding whether a jury is constitutionally mandated under the Seventh Amendment, courts engage in a two-pronged inquiry. *See Terry*, 494 U.S. at 565, 110 S. Ct. 1339. "First, we compare the statutory action to 18th-century actions brought in the courts of England prior to the merger of the courts of law and equity. Second, we examine the remedy sought and determine whether it is legal or equitable in nature." *Id.* (quoting *Tull*, 481 U.S. at 417-418, 107 S. Ct. 1831). "The second stage of this analysis is more important than the first." *Id.* (quoting *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 42, 109 S. Ct. 2782, 106 L. Ed. 2d 26 (1989)).

As to the first prong, courts have compared damages under anti-discrimination laws to common law torts brought before courts of law in 18th-century England. *See Dodd*, 541 F. Supp. 3d at 324 (collecting cases). Thus, the first prong is satisfied.

Turning to the second prong, neither the Supreme Court nor the Fifth Circuit has issued binding precedent addressing whether backpay under the Rehabilitation Act or Title VI is a legal or equitable remedy. Before addressing this issue, the Court must determine whether legal damages are available at all under § 504. In dicta, in a decision issued in 1983, the Fifth Circuit noted that "while we specifically do not decide this issue, jury trials do *not* appear to be a matter of right under the Rehabilitation Act." *Doe v. Region 12 Mental Health-Mental Retardation Comm'n*, 704 F.2d 1402, 1406 n.3 (5th Cir. 1983) (emphasis added). However, context is important. The panel in *Doe* based this dicta on a finding that "*only* equitable remedies" were allowed under § 504 of the Rehabilitation Act. *Id.* (emphasis added).

8

But since *Doe* was decided, the Supreme Court has interpreted Title IX to allow not just equitable remedies but also legal damages. *Franklin,* 503 U.S. at 66-68, 112 S. Ct. 1028. This is significant because, as noted previously, the remedies available under Title IX mirror those available under Title VI. *Waldrop*, 24 F.3d at 157 n.5; *see also Barnes*, 536 U.S. at 185, 122 S. Ct. 2097 (holding the Supreme Court has interpreted Title IX consistently with Title VI).[6] Since the *Franklin* decision, "[e]very circuit… has held that compensatory [or legal] damages are available under § 504 [of the Rehabilitation Act]." *Moreno v. Consol. Rail Corp.*, 99 F.3d 782, 789 (6th Cir. 1996) (collecting cases).[7] While the Fifth Circuit has not directly addressed the issue, this Court agrees with the overwhelming majority of courts that have found legal damages are available under § 504 of the Rehabilitation Act.

Having resolved that legal damages, and thereby jury trials, are available under § 504 of the Rehabilitation Act, the Court turns to the specific relief at issue in this case—backpay—and must determine whether it constitutes a legal remedy that entitles Cooper to a jury trial. *See Curtis v. Loether*, 415 U.S. at 194-98, 94 S. Ct. 1005. Without controlling authority from the Fifth Circuit, the Court turns to decisions of other Circuits.

In *Waldrop*, the Eleventh Circuit reversed a district court's conclusion that a claim for backpay under § 504 of the Rehabilitation Act constituted an equitable remedy. *Waldrop*, 24 F.3d at 157. In reaching this decision, the Eleventh Circuit held that a claim for backpay is *legal* in nature and explained that "the general rule [is] that back wages are legal relief in the nature of

---

[6] The *Waldrop* Court explained "it is well-established that Congress intended the same remedies be available under Title IX and Title VI. *Guardians Assoc. v. Civil Serv. Comm'n*, 463 U.S. 582, 594, 103 S. Ct. 3221, 3228, 77 L. Ed. 2d 866 (1983) (White, J., plurality). Thus, *Franklin* establishes that damages are available in Title VI cases as well as Title IX cases. Similarly, given that Congress specifically provided that the same remedies be available under § 504 as are available under Title VI, *Franklin* must permit damage awards for discrimination under § 504." *Waldrop*, 24 F.3d at 157 n.5.

[7] Generally, but not always, an action for money damages constitutes legal relief. *Waldrop*, 24 F.3d at 157 (citing *Terry*, 494 U.S. at 570, 110 S. Ct. 1339)) (additional citation omitted).

compensatory damages." *Id.* at 158 (emphasis added).[8] Importantly, the *Waldrop* court also dismissed, as NMMC argues, that backpay is restitution that should be treated as an equitable remedy. *Id.* at 157 (quoting *Abermarle Paper Co. v. Moody*, 422 U.S. 405, 415-19, 95 S. Ct. 2362, 45 L. Ed. 2d 280 (1975)). Additionally, other courts have found that backpay under the Rehabilitation Act is a legal remedy that requires a jury trial under the Seventh Amendment. *See, e.g.*, *Pandazides*, 13 F.3d at 832 (holding that an award of backpay under § 504 should not be characterized an equitable remedy); *Dodd*, 541 F. Supp. 3d at 324 (holding that backpay pursuant to § 504 "is plainly of a compensatory, legal nature").

In contrast, the Ninth Circuit, in *Lutz v. Glendale Union High Sch., Dist. No. 205*, concluded that backpay was an equitable remedy because the Rehabilitation Act, like the Americans with Disabilities Act ("ADA"), adopts the Title VII remedial scheme. 403 F.3d 1061, 1069 (9th Cir. 2005). However, the *Lutz* court failed to consider the fact that the Rehabilitation Act only adopts Title VII remedies for claims brought against *federal employers* under § 501. *See* 29 U.S.C. § 794a(a)(1). By contrast, claims under § 504 against non-federal employers, like NMMC, utilize the remedial scheme under Title VI as the Court has extensively explained above. *See id.* at § 794a(a)(2). Other courts have noted this distinction in deciding not to follow the Ninth Circuit's determination in *Lutz*. *See Dodd*, 541 F. Supp. 3d at 322-324; *accord Waldrop*, 24 F.3d at 158-159.

Ultimately, this Court agrees with the majority of courts that have decided this issue and concludes that a plaintiff is entitled to a jury trial under the Seventh Amendment in a § 504 case

---

[8] The court also pointed out the Supreme Court's conclusion that backpay constitutes compensatory damages when analyzing other employment discrimination statutes. *Id.* at 157; *see also Wooddell v. International Bhd. of Elec. Workers, Local 701*, 502 U.S. 93, 97, 112 S. Ct. 494, 116 L. Ed. 2d 419 (1991) (concluding that backpay under the Labor Management Reporting and Disclosure Act of 1959 constitutes a legal remedy); *Terry*, 494 U.S. at 570, 110 S. Ct. 1339 (concluding that backpay pursuant to § 301 of the Labor-Management Relations Act constitutes a legal remedy).

wherein the plaintiff seeks backpay as a remedy. *See, e.g.*, *Pandazides*, 13 F.3d at 832; *Waldrop*, 24 F.3d at 159; *Dodd*, 541 F. Supp. 3d at 324; *accord Hernandez v. City of Hartford*, 959 F. Supp. 125, 134 (D. Conn. Mar. 14, 1997) (holding that there is a right to a jury trial under the Rehabilitation Act). The Court finds these cases, specifically *Waldrop*, persuasive.[9]

This Court finds that Cooper's claim for backpay pursuant to § 504 constitutes legal relief thereby entitling him to a jury trial under the Seventh Amendment. Accordingly, NMMC's Motion to Strike [56] is hereby DENIED.

## II.  Motion for Summary Judgment [58]

In his Complaint [1], Cooper alleges that NMMC discriminated against him because of his disability, refused to provide him with an accommodation, and retaliated against him for threatening to bring a lawsuit—all in violation of the Rehabilitation Act. In seeking summary judgment, NMMC argues that (1) Cooper fails to make out a *prima facie* case for discrimination and cannot demonstrate pretext, (2) Cooper's failure-to-accommodate claim is untimely and fails on the merits, (3) Cooper cannot establish a *prima facie* case for retaliation, and (4) Cooper failed to mitigate his damages. The Court will address the arguments in turn.

### A.  Legal Standard

Summary judgment is warranted when the evidence reveals no genuine dispute regarding any material fact, and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and

---

[9] The Court notes that, in arguing for this Court to reach a contrary result, NMMC relies on case law that does not address the backpay issue. *See, e.g., Doe v. Horne*, 2024 WL 69645, at *1 (D. Ariz. Jan. 5, 2024) (plaintiffs only sought injunctive relief); *Heaton v. U.S. Postal Serv.*, 2007 WL 295609, at *3 (D. Neb. Jan. 29, 2007) (holding that the Rehabilitation Act did not abrogate sovereign immunity); *Matthews v. Jefferson*, 29 F. Supp. 2d 525, 537 (W.D. Ark. 1998) (holding that "a jury trial is available in … § 504 cases where the plaintiff claims intentional discrimination and seeks legal relief in the form of monetary damages"). The Court declines to follow them.

upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Nabors v. Malone*, 2019 WL 2617240, at *1 (N.D. Miss. June 26, 2019) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)).

"The moving party 'bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact.'" *Id*. (quoting *Celotex*, 477 U.S. at 323, 106 S. Ct. 2548). "The nonmoving party must then 'go beyond the pleadings' and 'designate specific facts showing that there is a genuine issue for trial.'" *Id*. (quoting *Celotex*, 477 U.S. at 324, 106 S. Ct. 2548). Importantly, "the inferences to be drawn from the underlying facts contained in the affidavits, depositions, and exhibits of record must be viewed in the light most favorable to the party opposing the motion." *Waste Mgmt. of La., LLC v. River Birch, Inc.*, 920 F.3d 958, 964 (5th Cir. 2019) (quoting *Reingold v. Swiftships, Inc.*, 126 F.3d 645, 646 (5th Cir. 1997)). However, "[c]onclusory allegations, speculation, unsubstantiated assertions, and legalistic arguments are not an adequate substitute for specific facts showing a genuine issue for trial." *Nabors*, 2019 WL 2617240 at *1 (citing *TIG Ins. Co. v. Sedgewick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002)) (additional citations omitted).

### B. Unlawful Discrimination under the Rehabilitation Act

NMMC argues that Cooper cannot establish a *prima facie* case of discrimination because he cannot show his disability was the sole cause of his termination, nor can he demonstrate that NMMC's reason for his termination was pretextual. [59] at p. 11. As noted previously, Cooper brings his discrimination claim exclusively under the Rehabilitation Act, which provides that "[n]o otherwise qualified individual with a disability [] shall, *solely by* reason of [] his disability, be

excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S. C. § 794(a) (emphasis added).

Rehabilitation Act claims are analyzed under the *McDonnell Douglas* burden-shifting framework. *Houston v. Texas Dep't of Agric.*, 17 F.4th 576, 585-86 (5th Cir. 2021) (citation omitted). In order to establish a *prima facie* case of discrimination under the Rehabilitation Act, "[Cooper] must prove that (1) [he] is an 'individual with a disability'; (2) who is 'otherwise qualified'; (3) who worked for a 'program or activity receiving Federal financial assistance'; and (4) that [he] was discriminated against 'solely by reason of [] his disability.'" *Id.*

The Rehabilitation Act expressly incorporates the ADA's employment discrimination standards by cross reference. 29 U.S.C. § 794(d). However, whereas the ADA only requires that the individual's disability be a motivating factor, the Rehabilitation Act requires the individual's disability be the *sole cause* of the adverse employment action. *Harmon*, 158 F.4th 595, 608 (5th Cir. 2025) (citing *Soledad v. U.S. Dep't of Treasury*, 304 F.3d 500, 505 (5th Cir. 2002)).[10] The sole cause standard is a "high bar" for a plaintiff to meet. *Cromwell v. Boa Vida Hosp. of Aberdeen, MS LLC*, 2022 WL 331209, at *4 (N.D. Miss. Feb. 2, 2022). Importantly, the sole cause standard only applies to claims for discrimination under the Rehabilitation Act—not failure-to-accommodate or retaliation claims. *Id.*

Under the *McDonnell Douglas* burden-shifting framework, after a plaintiff meets his initial burden to demonstrate a *prima facie* case of discrimination, the burden shifts to the defendant employer to articulate a legitimate, non-discriminatory reason for their action against the plaintiff.

---

[10] Cooper makes some argument that a lesser causation standard should apply but ultimately concedes this Court is bound by Fifth Circuit precedent holding that the 'sole cause' standard applies to his discrimination claim.

*Id.* at *4. The burden then shifts back to the plaintiff, who must demonstrate that the defendant's stated reason was merely a pretext for discriminatory action. *Id.*

As to the *prima facie* case, NMMC concedes the first three elements. It makes some argument that Cooper cannot satisfy the causation element because the RIF was the sole cause of Cooper's termination. But, as the Court will discuss in its pretext analysis, Cooper's contention is that he was included in the RIF because of his disability. Because the bulk of the argument surrounds pretext, the Court will address the issue in that portion of its analysis. *See generally Williams v. B R F H H Shreveport, L.L.C.*, 801 Fed. Appx. 921, 926 (5th Cir. 2020) (holding the *prima facie* causal link analysis and the pretext analysis are both causation inquiries and the only "functional difference" is the burden at the pretext stage is more stringent).

Here, NMMC proffers that its legitimate, non-discriminatory reason for terminating Cooper was the 400-person RIF. [59] at p. 11. That is sufficient for purposes of this stage of the proceedings.

The burden now shifts to Cooper to demonstrate pretext. To be clear, in his Response Memorandum [65], Cooper does not argue that the RIF itself was pretextual. [65] at p. 11. Instead, he argues that the criteria used to select him for the RIF was discriminatory. *Id.*[11]

To support his position, Cooper relies on *Gosby v. Apache Indus. Servs., Inc.*, 30 F.4th 523 (5th Cir. 2022). In *Gosby*, an ADA case, the plaintiff, Gosby, who was a diabetic, was hired as a temporary employee on a construction site. *Id.* at 524. A few weeks later, Gosby, while at work, suffered a diabetic attack. *Id.* at 525. She received medical treatment and was sent home for the remainder of the day. *Id.* Roughly a week later, Gosby, along with eleven other employees, was

---

[11] The Court notes that Cooper briefly contends that his termination was not a part of the RIF. However, Cooper does not make substantive arguments on this point, and the Court sees no reason to address it further.

selected for inclusion in a RIF. *Id.* Following her termination, Gosby filed suit against her employer for discrimination under the ADA. *Id.*[12]

When the employer raised the RIF as its legitimate, non-discriminatory reason for the termination, Gosby asserted that, while the RIF itself was not discriminatory, her inclusion in it was based on her disability. *Id.* at 527-28. The Fifth Circuit agreed with Gosby, noting that the employer failed "to express coherent, consistent criteria it used in reducing the force" and this "lack of evidence of a meaningful assessment process" was indicative that the employer's proffered explanation was unworthy of credence. *Id.* Consequently, the court concluded that an issue of material fact remained regarding whether the employer discriminated against Gosby on the basis of her disability by *including her* in the RIF. *Id.* at 529.

In light of *Gosby*, the Court turns to the criteria NMMC used to select Cooper for the RIF. NMMC tasked West with implementing the RIF in the departments he oversaw within the IS group. During his deposition, West explained:

Q. So how did you choose Cooper [for the RIF]?

A. So I looked at all the positions in my 50-plus team members and -- the first criteria was picking the person that I thought would be the least disruptive to the operations of the hospital and whether that meant other people could absorb those responsibilities of that person, whether I thought that was the least productive, . . . the amount of work being generated by that particular position. And so that's why I selected Cooper.

Q. But Cooper does the same job as . . . 14 other folks; correct?

A. He has the same title, but [] not day-to-day activities, he was not doing the same things as the other people.

---

[12] Despite the similarities, the Court acknowledges that ADA claims do not apply the sole cause standard. Nevertheless, given the scant case law interpreting discrimination claims exclusively under the Rehabilitation Act in the RIF context, and the similarities between the Acts, the Court finds the analysis instructive. *See Cohen v. Univ. of Tex. Health Sciences Center*, 557 Fed. App'x 273, 277 (5th Cir. 2014) (holding the ADA and Rehabilitation Act are "jointly interpreted"); *Hainze v. Richards*, 207 F.3d 795, 799 (5th Cir. 2000) ("Jurisprudence interpreting either section is applicable to both").

Q.    How did you come to that conclusion?

A.    Based on interactions with Perry Morgan [Cooper's supervisor].

Q.    What was different about Cooper's day-to-day as opposed to the other . . . 14 folks?

A.    [] His primary role was imaging -- or primary activities were imaging work stations, whether it be laptops, desktops. It's a very automated process. It doesn't require a lot of troubleshooting skills. It's very repetitive.

       And he didn't do it for all the team members. Some team members did their imaging themselves. They would image work stations at the end of the day, let them run over night, come back, and they're done the next morning.

Q.    And so what were other team members doing that Cooper wasn't doing?

A.    I call it break/fix, troubleshooting issues, problems with end users.

Q.    Is that -- would that be work orders?

A.    Yes.

Q.    I think I've heard that term. And I would -- is troubleshooting work orders kind of the same thing?

A.    Yeah. Work orders, installation, going out and doing assessments of new clinic openings, new department openings, understanding end users' needs.

Q.    And so are you saying that Cooper was not doing that at all or he was doing it less than some of the other employees in that group?

A.    It was my understanding he was doing that less than other people.

[64], Ex. 2 at p. 18-20.

       To be clear, West's explanation for selecting Cooper is that he was not doing the same tasks as other employees. He then provides the reason for why Cooper was not:

Q.    Do you know *why he was doing that less than other people* in the group?

A.    Perry Morgan's comments to me were he worked with -- worked with Mr. Cooper to accommodate -- Perry reported at various times *Cooper would have trouble with mobility*, you know, getting around, going out to the sites.

16

> And so *Perry Morgan stated that he had allowed Cooper to just do imaging of PCs, just desk work.*

> Q. Did Perry indicate to you that Cooper had asked for that?

> A. He did not.

> Q. Were you under the impression in any way that Cooper had asked to only do desk work?

> A. I was not.

*Id.* at p. 20 (emphasis added).

Unlike in *Gosby*, where the Fifth Circuit found telling the *lack* of criteria for inclusion in the RIF, in this case, West admitted that he included Cooper in the RIF because he only performed desk work and further testified to knowing the reason Cooper was doing so was because of his mobility issues. The Court finds this to constitute stronger evidence of pretext than was at issue in *Gosby*. Additionally, in his deposition, West made it clear that the RIF was the *only* reason Cooper was terminated:

> Q. At the time that Cooper was terminated, did you consider Cooper to still be qualified for the job that he held?

> A. Yes.

> Q. Did you have any issues with Cooper's job performance?

> A. I did not.

> Q. Was there -- were there any personality conflict problems that you were aware of related to Cooper specifically?

> A. Not that I'm aware of.

> Q. Do you know if Cooper was well liked by his coworkers or not?

> A. He seemed to be.

[64], Ex. 2 at p. 21.[13]

Thus, there is competent summary judgment evidence to indicate that the RIF was the only reason Cooper's employment was terminated and that Cooper was only included in the RIF because of his disability. In light of that fact, even considering the more demanding sole cause standard, the Court finds that Cooper has provided sufficient evidence to preclude summary judgment on his discrimination claim.

### C. Failure to Accommodate

NMMC argues that Cooper's failure-to-accommodate claim is barred by the statute of limitations and fails on the merits. The Court will address each argument in turn.

### a. Statute of Limitations

There is no federal statute of limitations for claims under the Rehabilitation Act, so courts must "borrow" from the state's general personal injury statute of limitations period. *Dansby-Giles v. Jackson State Univ.*, 2011 WL 1297145, at *4 (S.D. Miss. Mar. 31, 2011) (citing *Hickey v. Irving Independent School Dist.*, 976 F.2d 980, 983 (5th Cir. 1992)). It is well settled that Mississippi's three-year general statute of limitations applies in failure-to-accommodate claims brought under the Rehabilitation Act. *Id.*

The question here is when the three-year period began to run. NMMC argues that the statute of limitations began to run when Cooper first requested the automatic doors be installed after he returned to work in October 2019 and, since Cooper did not file suit until roughly five years later on October 22, 2024, his claim is time-barred. Cooper argues that NMMC had an 'ongoing'

---

[13] Importantly, unlike in cases granting summary judgment, NMMC fails to present any evidence of professional misconduct or poor performance. *See Cromwell*, 2022 WL 331209 at *4-5 (defendant provided evidence of a myriad of professional misconduct); *see also Alkhawaldeh v. Dow Chem. Co.*, 851 F.3d 422, 430 (5th Cir. 2017) (holding poor performance not a protected activity protected by Title VII).

requirement to accommodate employees. In 2011, the Southern District of Mississippi considered the issue on relatively similar facts. *See Dansby-Giles*, 2011 WL 1297145 at *4.

In *Dansby-Giles*, the plaintiff suffered from multiple health issues that qualified as disabilities under the ADA and Rehabilitation Act. *Id.* at *1. Beginning in 2005, the plaintiff continually made requests for various accommodations that she alleged the defendant failed to provide. *Id.* In that case, the defendant argued that the statute of limitations began to run "as soon as [the plaintiff] learned she did not receive a requested accommodation[.]" *Id.* The defendant then argued that, since plaintiff had filed the operative complaint on November 19, 2009, any claim for accommodations she sought and which defendant failed to provide prior to November 19, 2006 was barred by the statute of limitations. *Id.*[14]

The plaintiff did not dispute this, instead she argued that she requested and was denied accommodations during the three years preceding the filing of her complaint. *Id.* The court held that claims based on accommodations *denied* prior to November 19, 2006 were time barred, but claims based on accommodations denied during the three years preceding the lawsuit were not time-barred. *Id.* And, since the plaintiff made requests for accommodation that were denied during and after 2007, those claims fell within the three-year limitation period. *Id.* at n.7.

Here, it is undisputed that Cooper made his first request for an accommodation after returning to work in 2019 and that Cooper repeatedly made this request on a regular basis up until his termination in May 2023. The issue before the Court is when Cooper's request for accommodation was *denied* thereby triggering statute of limitations.

On this point, Cooper testified in his deposition as follows:

Q.     . . . With respect to these doors, at some point in time did you ask that the door between the office and the warehouse and the door between the outside

---

[14] To be precise, the plaintiff filed three separate lawsuits with the first one filed in 2007, but the district court's decision concerned only the November 19, 2009 complaint.

and the warehouse -- did you ask that it be fitted with some device that would hold it open?

A.   Yes, sir.

Q.   Okay. And you asked that of – who did you ask that of?

A.   John West --

Q.   Okay.

A.   -- Perry Morgan, and Steve Newby.

Q.   Okay.

A.   Every Tuesday they have a meeting. And every Tuesday, just about, I went in and told them, Don't forget to ask about getting an automatic door put in.

Q.   Okay.

A.   For four years.

Q.   And what was their response?

A.   Steve Newby, Perry, and John West, they were never in the same office but always said the same thing. And they would write it down and say that they will bring it up in the meeting.

Q.   Okay.

A.   To the higher up.

[64], Ex. 1 at p. 97-98.

The record shows that West got a quote to install automatic doors from a contractor on July 11, 2022, but ultimately did not go through with the deal because the contractor became unresponsive. [64], Ex. 4 at p. 18. The last attempted contact with the contractor occurred on November 22, 2022. In May 2023, West turned the request for accommodation over to NMMC's in-house engineering department.

20

In summary, the record shows that NMMC did not explicitly deny Cooper's request for accommodation and took some steps to install the automatic doors. However, NMMC seemingly does not dispute that his request for accommodation was ultimately denied. The Court finds that a question of fact remains as to the timing of precisely when Cooper's request for accommodation was denied.

The statute of limitations begins once a request for accommodation is denied and, while the exact date is unclear, the Court finds that Cooper's failure-to-accommodate could fall within the statute of limitations.

b.      *Reasonableness of the Accommodation*

Turning to the merits, a failure-to-accommodate claim requires a showing that: "(1) the plaintiff is a qualified individual with a disability; (2) the disability and its consequential limitations were known by the covered employer; and (3) the employer failed to make reasonable accommodations for such known limitations." *Weber v. BNSF Railway Co.*, 989 F.3d 320, 323 (5th Cir. 2021).

The ADA's implementing regulations, which the Rehabilitation Act incorporates, define a reasonable accommodation in part as "[m]odifications or adjustments to the work environment ... that enable an individual with a disability who is qualified to perform the essential functions of that position." *Feist*, 730 F.3d at 453 (citing 29 C.F.R. § 1630.2(o)(1)). The appropriate accommodation need not be "the employee's preferred accommodation," and the employer is free to "choose the less expensive accommodation or the accommodation that is easier for it to provide." *Thompson v. Microsoft Corp.*, 2 F.4th 460, 469 (5th Cir. 2021). When a disability is known and "an employer's unwillingness to engage in a good faith interactive process leads to a

failure to reasonably accommodate an employee, the employer violates the ADA." *Harmon*, 158 F.4th at 611 (citing *Loulseged v. Akzo Nobel Inc.*, 178 F.3d 731, 736 (5th Cir. 1999)).

NMMC argues that Cooper's failure-to-accommodate claim fails because "installation of two automatic doors was not reasonable… [or] necessary." [59] at p. 9. The Court finds that NMMC's actions cut against this argument. The record shows that NMMC intended, at least arguably, to install the automatic doors—going as far as getting a quote and budgeting for the expense. West, on behalf of NMMC, testified:

> Q.   And I'll just read [the quote] as $5,789. The date at the top of this is July 11th, 2022. What [] stopped [NMMC] from installing these doors that were quoted?
>
> A.   The [] quote has a signature line with a statement of work. By policy, how we operate is anything like that requires a signature with language and terms and conditions has to be routed through our legal department for signature[.]
>
>       . . .
>
> Q.   Okay. But you're just saying it just never got signed for these to be installed?
>
> A.   Yes. Legal and their legal team went back and forth on the terms and conditions and could never come to an agreement. Basically [the contractor] became nonresponsive.

[64], Ex. 4 at p. 16-17.

West then clarified that the quoted price was not the issue:

> Q.   Okay. So the $5,789 for these automatic doors, that wasn't outside of [] the budget for IT?
>
> A.   No. [O]ver [$]5,000 is a capital expense, but we had minor equipment capital available to pay for that. That's how I was going to fund that.

*Id.* at p. 22-23.

West additionally testified that, after Cooper was terminated, NMMC did not pursue automating the door:

Q. . . . And so Cooper wasn't there anymore, and so nobody else was complaining about the interior door.

A. Correct. He's the only person that asked for that.

Q. Okay. And so without [] Cooper there to ask for it, there was no need to change the interior door [?]

A. Correct. Yeah.

*Id.* at p. 25.[15]

NMMC makes an additional argument that it was not obligated to choose Cooper's preferred accommodation and Cooper could have used an alternative route or method to transport equipment through the warehouse. NMMC identified two "handicapped" doors that offered access to the warehouse. Regarding the alternative route, Cooper testified that the closest alternative route was 100 yards away from his desk.

NMMC is correct that it is not obligated to choose Cooper's preferred accommodation, but, importantly, the record is devoid of any evidence that it even investigated or pursued any alternative accommodation.[16] Nor did NMMC engage in any discussion with Cooper about an alternative accommodation. *Compare Thompson*, 2 F.4th at 469 (finding that the employer worked in good faith with employee by explaining why a requested accommodation was unreasonable and asking him to respond with alternative accommodations). In addition, there is nothing in the record to indicate that NMMC suggested to Cooper that he take an alternate route through the warehouse. In fact, NMMC recognized Cooper's mobility issues and provided him some accommodation by

---

[15] As noted previously, the in-house engineering department installed a "hold-open" function on the exterior door after Cooper was terminated. However, the design of the interior door prevented a "hold-open" function and NMMC pursued no alternatives.

[16] The Court notes that, after the contractor became unresponsive, West did inform the in-house engineering department of the problem with the doors and asked for solutions in May 2023. Notwithstanding, the interior door was never modified and the exterior door was not modified until August 2023, after Cooper had already been terminated.

23

allowing him to primarily do desk work. Given Cooper's undisputed mobility issues and NMMC's failure to seek an alternative accommodation, the Court finds this argument, for the purposes of summary judgment, unavailing.

To the extent NMMC argues that the requested accommodations were not reasonable or necessary, the Court finds the evidence in the record precludes summary judgment. *See generally Antoine v. First Student, Inc.*, 713 F.3d 824, 831 (5th Cir. 2013) (explaining, in a Title VII case, "[w]hether an accommodation is reasonable is a question of fact."). An issue of material fact remains as to whether Cooper's requested accommodation was reasonable and/or necessary.

### D.     Retaliation

Lastly, the Court turns to Cooper's retaliation claim. In order to establish "a prima facie case of retaliation under the ADA or Title VII [or the Rehabilitation Act], a plaintiff must show that (1) he participated in an activity protected under the statute; (2) his employer took an adverse employment action against him; and (3) a causal connection exists between the protected activity and the adverse action." *Feist*, 730 F.3d at 454 (citing *Seaman v. CSPH, Inc.*, 179 F.3d 297, 301 (5th Cir. 1999)). Retaliation claims under the Rehabilitation Act employ a "but for" causation standard. *Harmon*, 158 F.4th at 608.

In evaluating a causal connection, a court "may look to (1) [Cooper]'s past disciplinary record, (2) whether [NMMC] followed a policy in penalizing [Cooper], and (3) the temporal proximity between [Cooper]'s protected activity and [NMMC]'s adverse actions." *Schroeder v. Greater New Orleans Fed. Credit Union*, 664 F.3d 1016, 1024 (5th Cir. 2011); *see also Smith v. Xerox Corp.*, 371 Fed. Appx. 514, 520 (5th Cir. 2010) (noting that existence of a causal link is highly fact specific). If relying exclusively on temporal proximity, a plaintiff must establish "[c]lose timing between an employee's protected activity and an adverse action against him."

24

*McCoy v. City of Shreveport*, 492 F.3d 551, 554 (5th Cir. 2007); *See, e.g., Lyons v. Katy Indep. Sch. Dist.*, 964 F.3d 298, 304-05 (5th Cir. 2020) (finding a six-and-a-half-week timeframe is sufficiently close without other evidence of retaliation) (collecting cases); *Decou-Snowton v. Jefferson Parish*, 2024 WL 4879466, at *7 (5th Cir. Nov. 25, 2024) (citing *Garcia v. Pro. Cont. Servs., Inc.*, 938 F.3d 236, 243 (5th Cir. 2019)) (explaining that the Fifth Circuit "construes [temporal proximity] to be two-and-one-half months").

A plaintiff unable to establish a causal connection based on temporal proximity alone must point to other evidence, such as "an employment record that does not support dismissal, or an employer's departure from typical policies and procedures." *Feist*, 730 F.3d at 454-55. The Fifth Circuit has "allowed plaintiffs to show causation by relying on 'a chronology of events from which retaliation may plausibly be inferred.'" *Simonton v. Houston Methodist Continuing Care Hosp.*, 2025 WL 1747023, at *14 (S.D. Tex. June 9, 2025) (citing *Benfield v. Magee*, 945 F.3d 333, 338 (5th Cir. 2019)) (citation omitted); *see also Decou-Snowton,* 2024 WL 4879466 at *7 ("[A] causal connection can be established by otherwise raising a material issue of fact as to whether the actions taken against the employee were caused by the protected activity."). The standard for proving causation is less stringent at the *prima facie* stage than at the pretext stage. *Donnelly v. Acad. P'ships L.L.C.*, 2024 WL 1877043, at *5 (5th Cir. 2024).

If a plaintiff establishes a *prima facie* case of retaliation, the *McDonnell Douglas* burden-shifting framework applies. *Feist*, 730 F.3d at 454 (citations omitted). NMMC argues that Cooper cannot establish a *prima facie* case and, alternatively, that he cannot establish pretext.

As to the *prima facie* case, NMMC argues that Cooper cannot satisfy the causation element because there is a five-year gap between his first request for accommodation and his termination. [59] at p. 14. In response, Cooper argues that his threat to bring a lawsuit is a separate protected

25

activity and there is only a two-month gap between that protected activity and his termination. In other words, the basis for Cooper's retaliation claim is the threatened lawsuit, not his request for accommodation.

Before addressing causation, the Court must first determine whether the threat of a lawsuit for failure-to-accommodate is a separate protected activity for the purposes of a retaliation claim.

Recently, the Fifth Circuit explained that making a request for a reasonable accommodation under the ADA constitutes "participat[ing] in an activity protected under the statute" and also protects "individuals who oppose any practice of discrimination or make a charge of discrimination." *Way v. City of Missouri City*, 133 F.4th 509, 522 (5th Cir. 2025) (quoting *Lyons*, 964 F.3d at 304-05). In *Way*, the plaintiff suffered from anxiety and other health issues that were protected under the ADA. *Id.* at 514. After developing these health issues, she made a request for accommodation and two months later, complained to HR about how her manager treated her after learning of her medical problems. *Id.* The court found that the plaintiff engaged in two "protected activities related to her anxiety—requesting written expectations *and* complaining about [her manager] to HR—[which] occurred in August *and* November of 2019." *Id.* at 523 (emphasis added). While the court ultimately found that both these protected activities fell outside the required temporal proximity, it did consider the two as separate protected activities. *Id.*

Here, Cooper engaged in two different protected activities related to his disability—requesting an accommodation and threatening to bring a lawsuit. However, unlike *Way*, Cooper's retaliation claim is based solely on the second protected activity, threatening to bring a lawsuit, which occurred only two months before his termination. The Court finds that this second, separate protected activity distinguishes the case *sub judice* from other cases relied on by NMMC.[17]

---

[17] All the case law cited by NMMC quote a footnote in *Alkhawaldeh v. Dow Chemical Co.* that provides "a Title VII claimant cannot with each protected activity, re-start 'the temporal clock.'" *Alkhawaldeh*, 851

Now turning to the chronology of events, Cooper made his first request for accommodation after returning to work in October of 2019. He alleges that he continually made this request on a weekly or bi-weekly basis until his termination. After Cooper fell on May 16, 2023, he approached West and threatened to bring a lawsuit by stating "I [am] going to call Mama Justice if [you] [don]'t get the damn thing [interior door] fixed" and he also threatened to call "the [ADA] and everybody else with the disability act." [64], Ex. 1 at p. 156.[18] Cooper was terminated on July 13, 2023.

The Court finds the temporal proximity, for the purposes of establishing a *prima facie* case, is sufficiently close to establish a causal connection. *Lyons*, 964 F.3d at 305 (six-and-a-half weeks timeframe sufficiently close); *Decou-Snowton,* 2024 WL 4879466 at *7 (collecting cases to support the proposition that "two-and-one-half months is the outermost limit"). Specifically, there was a time lapse of approximately two months between Cooper's threat to bring a lawsuit and his termination. While the temporal proximity alone is sufficiently close in this case to preclude summary judgment, the other relevant factors also weigh in Cooper's favor.

To reiterate, the other causal connection factors include past disciplinary record and whether the employer followed a policy in penalizing employee. *Schroeder*, 664 F.3d at 1024 (5th Cir. 2011). Concerning his employment record, the record in this case shows that Cooper worked for 24 years at NMMC without any disciplinary issues. [64], Ex. 1 at p. 164; [64], Ex. 3 at p. 18. Next, it is unclear to the Court whether NMMC followed a "policy", or if one even existed, in selecting Cooper for the RIF. The record shows that the Human Resources department directed West to terminate Perry Morgan but allowed West to select (without explicit criteria or quota)

---

F.3d at 428 n.23. However, that decision only addressed temporal proximity in dicta and the holding relied on the plaintiff's poor performance reviews. *Id.* at 429-30. This Court does not find the dicta persuasive.

[18] For context, "Mama Justice" is a personal injury attorney that advertises her services throughout North Mississippi. The Court also notes that while the ADA is not a government agency, Cooper seemingly threatened to report NMMC to a government agency for its failure to accommodate. At a minimum, a reasonable jury could infer such from this alleged statement.

additional employees to terminate. [64], Ex. 2 at p. 13-14; *see Schroeder*, 664 F.3d at 1024 (employer followed no policy in terminating plaintiff); *compare Roberson v. Alltell Info. Servs.*, 373 F.3d 647, 652-53 (5th Cir. 2004) (employer based its RIF selections on objective criteria). The Court finds both these factors weigh in favor of a finding of causation.

Taking into account the relevant factors, the Court finds that Cooper has established a *prima facie* case. *See Dixon v. Gonzales*, 481 F.3d 324, 335 (6th Cir. 2007) ("It is important to emphasize that it is causation, not temporal proximity itself, that is an element of plaintiff's prima facie case, and temporal proximity merely provides an evidentiary basis from which an inference can be drawn.") (citation omitted); *see also Donnelly*, 2024 WL 1877043 at *5.

The burden therefore shifts to NMMC, which again proffers the 400-person RIF as its legitimate, non-retaliatory reason for terminating Cooper. This is sufficient for summary judgment purposes. *Hinshohn v. Carabin & Shaw, P.C.*, 832 F.3d 224, 236 (5th Cir. 2016) (this step involves no credibility assessment) (citation omitted).

Thus, the burden falls back on Cooper to show pretext. At this stage, the essential question is whether the evidence, in its totality, supports an inference of retaliation. *Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 407 (5th Cir. 1999); *Arango v. Telemundo El Paso*, 20 F. Supp. 3d 559, 573 n.13 (W.D. Tex. Dec. 30, 2013) ("Although temporal proximity sufficed earlier to prove Plaintiff's prima facie case, the Fifth Circuit has held that it does not suffice to prove but-for causation.") (citation omitted). The Court, similar to its discrimination pretext analysis, finds critical three pieces of evidence.

First, the Court finds telling the lack of clear, coherent criteria in the RIF selection process. *See Gosby*, 30 F.4th at 528; *see also Cude v. Modine Grenada LLC*, 2024 WL 5058978, at *5 (N.D. Miss. Dec. 10, 2024) ("Evidence of 'inconsistent explanations and the absence of clear

28

criteria' in an employer's decision-making can be enough to survive summary judgment[.]") (citation omitted). West testified that he was directed to terminate EUD Manager Morgan because his position was redundant, but he then provided different (and vague) criteria for his decision to include Cooper in the RIF.

Second, Cooper had no disciplinary issues on his record. *See generally United States ex rel King v. Solvay Pharm., Inc.*, 871 F.3d 318, 333-34 (5th Cir. 2014) (positive performance reviews can be evidence of pretext); *compare Alkhawaldeh*, 851 F.3d at 428-29 (negative performance review precluded a finding of pretext).

Third, and most importantly, the temporal proximity (two-month gap) between the threatened lawsuit and Cooper's termination strongly supports Cooper's position. *See Way*, 133 F.4th at 525 ("[E]vidence that can [] demonstrate pretext include . . . close temporal proximity between an employee's protected activity and the employer's action.").

The Court notes that "the question is not whether [Cooper] proves pretext, but rather whether [he] raises a genuine issue of fact regarding pretext." *Amburgey v. Corhart Refractories Corp.*, 936 F.2d 805, 813 (5th Cir. 1991). He has done so. A reasonable jury could find that Cooper's inclusion in the RIF was pretext for retaliation.

*IV.     Failure to Mitigate*

Lastly, NMMC argues that Cooper should be prohibited from seeking backpay because he did not seek another job. The Court declines to decide this issue at this stage in the proceedings. Failure to mitigate is an affirmative defense that is properly tried before a jury. *See generally Newcomb v. Corinth School Dist.*, 2015 WL 1505839, at *7 (N.D. Miss. Mar. 31, 2015); *Cooper v. Majestic Mississippi, LLC*, 2022 WL 1460335, at *1-2 (N.D. Miss. May 9, 2022).

*Conclusion*

For the reasons set forth above, NMMC's Motions [56, 58] are DENIED. Cooper will be permitted to proceed to trial on all of his claims.

SO ORDERED, this the 28th day of May, 2026.

/s/ Sharion Aycock
SENIOR UNITED STATES DISTRICT JUDGE

30